# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JAMAR L. TRAVILLION,

      Plaintiff,

   v.

PENNSYLVANIA DEPARTMENT
OF CORRECTIONS, *et al.*,

      Defendants.

No. 1:18-CV-02075

(Chief Judge Brann)

## MEMORANDUM OPINION

### OCTOBER 13, 2023

Plaintiff Jamar Travillion filed this *pro se* Section 1983[1] action in 2018. Travillion, who is serial *pro se* prisoner litigant, alleged numerous constitutional violations against approximately two dozen prison officials, most of whom were employed at the State Correctional Institution, Rockview (SCI Rockview), in Bellefonte, Pennsylvania.  Many of Travillion's claims were dismissed at the Rule 12(b)(6) stage.  Only his First Amendment claims alleging retaliation and free-speech interference survived.  Presently pending is Defendants' motion for summary judgment on the remaining claims pursuant to Federal Rule of Civil Procedure 56.  The Court will grant in part and deny in part Defendants' motion.

---

[1]    42 U.S.C. § 1983.  Section 1983 creates a private cause of action to redress constitutional wrongs committed by state officials.  The statute is not a source of substantive rights; it serves as a mechanism for vindicating rights otherwise protected by federal law.  *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002).

## I.    FACTUAL BACKGROUND[2]

At all relevant times, Travillion has been incarcerated at SCI Rockview.[3]  In October 2018, he filed the instant Section 1983 lawsuit.[4]  Travillion's sprawling *pro se* complaint named more than two dozen defendants and purported to raise constitutional claims under the First, Fourth, Eighth, and Fourteenth Amendments, as well as several state-law tort claims.[5]  Travillion filed what can only be deemed a "kitchen-sink" or "shotgun" style pleading, using run-on sentences and catchall, conclusory language in an attempt to allege that dozens of SCI Rockview employees were involved in a grand conspiracy to violate his constitutional rights.  He amended his complaint in June 2019,[6] and that amended complaint is the operative pleading in this action.

The amended complaint, which is no less sweeping and problematic than its original counterpart, asserted 16 counts of alleged constitutional and state-law torts.  Those claims consisted of: First Amendment freedom of speech (Count 1),

---

[2]    Local Rule of Court 56.1 requires that a motion for summary judgment be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  LOCAL RULE OF COURT 56.1.  A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried.  *Id.*  Defendants filed their statement of material facts, (Doc. 139), and Travillion filed his responsive statement of facts, (Doc. 174).  To the extent that any fact is undisputed, the Court will cite directly to the parties' statements of facts.

[3]    Doc. 139 ¶ 1; Doc. 32 ¶ 3.

[4]    *See generally* Doc. 1.

[5]    *See id.* ¶¶ 1, 4-29.

[6]    *See generally* Doc. 32.

First Amendment free exercise of religion (Count 2), First Amendment access to courts (Count 3), First Amendment retaliation (Count 4), Fourth Amendment unreasonable search and seizure (Count 5), Eighth Amendment cruel and unusual punishment (Count 6), Fourteenth Amendment procedural due process (Count 7), Fourteenth Amendment substantive due process (Count 8), Fourteenth Amendment equal protection (Count 9), Religious Land Use and Institutionalized Person Act claims (Count 10), civil rights conspiracy under Section 1983 (Count 11), civil rights conspiracy and obstruction of justice under Section 1985(2) (Count 12), civil rights conspiracy and equal protection under Section 1985(3) (Count 13), conversion (Count 14), "willful and wanton misconduct" (Count 15), and intentional infliction of emotional distress (Count 16).[7]

Defendants moved to dismiss[8] the amended complaint and, following comprehensive briefing and multiple extension requests by Travillion,[9] that motion was decided on November 18, 2020.[10]  The Court's[11] November 18, 2020 Memorandum and Order dismissed all of Travillion's claims except Counts 1 and 4.[12]  Specifically, the Court permitted the case to proceed on Travillion's "First Amendment interference with mail claims (Count 1) contained in paragraphs 31-

---

[7]   *See* Doc. 81 at 8-9.
[8]   Doc. 52.
[9]   *See* Docs. 55-78.
[10]   *See generally* Doc. 81.
[11]   This case was previously assigned to my former colleague, the Hon. John E. Jones III, who ruled on Defendants' motion to dismiss.  *See id.*
[12]   *See id.* at 29.

50, naming Defendants [Pennsylvania Department of Corrections (DOC)], Wetzel, Boone, Wilson, Walters, Harpster, Garman, Beck, Probst, Vance, Caprio, McMahon, Sherman, and Smart Communications."[13]  The Court also permitted Travillion to proceed with his "First Amendment retaliation claims (Count 4) contained in paragraphs 34-36, 52, 53, 56-60, naming Defendants Boone, Wilson, Walters, Garman, Beck, Probst, Vance, Caprio, McMahon, Stabley, Cox, Paul, Rogers, Rossman, Loaner, and Chase."[14]  Additionally, the Court denied Defendants' motion to dismiss with respect to Travillion's request for prospective declaratory and injunctive relief.[15]

Travillion's remaining claims primarily involve the handling of his legal and personal mail from October 2016 to October 2018.  Some factual background regarding the DOC's evolving mail policies, therefore, is required.

During relevant times prior to September 2018, inmates' personal and legal mail was to be sent or hand-delivered to them at their prison address, but legal or "privileged" correspondence that was mailed required an attorney or court "control number" to be placed on the exterior of the envelope.[16]  This control number was provided by the DOC to authorized senders, giving prison mailroom staff a clear

---

[13]  *Id.* at 29 ¶ 1.

[14]  *Id.* at 29 ¶ 2.

[15]  *Id.* at 29 ¶ 3.

[16]  *See* COMMW. OF PA., DEP'T OF CORR., *Policy Statement* DC-ADM 803: Inmate Mail & Incoming Publications, § 2(A)(1), (B)(1), Glossary of Terms "Privileged Correspondence" (2) (Oct. 29, 2015) [hereinafter "DC-ADM 803 §__ (2015)"].

indication regarding what prisoner mail was officially deemed "privileged correspondence" and could only be opened in the presence of the inmate and what mail was nonlegal or "nonprivileged" correspondence that could be opened and inspected outside of the inmate's presence.[17]

In September 2018, the DOC changed its mail policy regarding, among other things, how incoming privileged and nonprivileged mail was handled.[18]  According to the DOC, the changes were implemented to curb entry of illicit drugs into state prisons through the use of drug-soaked inmate mail.[19]  Under the new policy, nonprivileged prisoner mail was to be sent to the DOC's contracted processor—defendant Smart Communications, in St. Petersburg, Florida—who would scan the nonprivileged correspondence and provide an electronic copy that would be printed and delivered to the prisoners at their respective facilities.[20]

As for "privileged correspondence," the following system was implemented: (1) incoming privileged mail would be opened and inspected for contraband in the inmate's presence; (2) the incoming privileged correspondence would then be

---

[17]  *See* DC-ADM 803 §§ 2(A)(1), 2(B)(1), (3) (2015); *Fontroy v. Beard*, 559 F.3d 173, 174-76 (3d Cir. 2009).

[18]  *See* Doc. 139 ¶¶ 30-31.

[19]  *Id.* ¶ 30; *Woodell v. Pa.D.O.C. Sec'y of Corr.*, No. 18-cv-4430, 2020 WL 2841380, at *10 (E.D. Pa. June 1, 2020).  Although Travillion challenges the veracity of the DOC's reason for the policy change, (*see* Doc. 174 ¶ 30), he does not dispute that this was the reason proffered by the DOC for its significant mail-policy changes.

[20]  *See* COMMW. OF PA., DEP'T OF CORR., *Policy Statement* DC-ADM 803: Inmate Mail & Incoming Publications, §§ 1(A)(3), (4), 1(C)(1)-(5) (Oct. 3, 2018) [hereinafter "DC-ADM 803 §__ (2018)"].

photocopied in the inmate's presence and a photocopy of the legal mail would be provided to the inmate; (3) prison officials would log the privileged correspondence in the "Legal Mail Log," which the inmate had to sign to receive the mail; (4) the original incoming privileged correspondence would then be placed into a sealed envelope inside a lockbox, ultimately to be "securely and confidentially destroyed."[21]

The constitutionality of the revised policy's treatment of privileged mail was swiftly challenged in federal court.[22]  Within a matter of months, the DOC acquiesced and agreed that, beginning on April 6, 2019, the copying and retention of inmates' privileged correspondence would end.[23]  The use of Smart Communications for nonprivileged correspondence, however, remains a fixture of the DOC's current mail system.[24]

With this background in place, the Court turns to the instant dispositive motion.  Following years of delay, much of which was occasioned by Travillion's repeated requests for extensions to the case management deadlines,[25] the parties have reached the Rule 56 stage.  Defendants move for summary judgment on

---

[21]  *See id.* § 1(D)(1)(a)-(e) (2018).

[22]  *See Pa. Institutional L. Project v. Wetzel*, No. 18-cv-2100, Doc. 1 (M.D. Pa. Oct. 30, 2018).

[23]  *See id.*, Doc. 92 (settlement agreement), Doc. 93 (court approval of settlement); Doc. 139 ¶ 40; Doc. 141-12 at 10-15.

[24]  *See* COMMW. OF PA., DEP'T OF CORR., *Policy Statement* DC-ADM 803: Inmate Mail & Incoming Publications, §§ 1(A)(3), 1(C)(1)-(5) (Aug. 10, 2020) [hereinafter "DC-ADM 803 §__ (2020)"].

[25]  *See e.g.*, Doc. 136 (denying Travillion's *seventh* motion to extend the case management deadlines).

Travillion's remaining First Amendment claims.[26]  Their Rule 56 motion is fully briefed and ripe for disposition.

## II.    STANDARD OF REVIEW

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."[27]  Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[28]  Material facts are those "that could alter the outcome" of the litigation, and "disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[29]

At the Rule 56 stage, the Court's function is not to "weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial."[30]  The Court must view the facts and evidence presented "in the light most favorable to the non-moving party" and must "draw all reasonable inferences in that party's favor."[31]  This evidence, however, must be adequate—as a matter of law—to sustain a judgment in favor of the nonmoving

---

[26]  Doc. 138.
[27]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).
[28]  Fed. R. Civ. P. 56(a).
[29]  *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (*quoting Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).
[30]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).
[31]  *Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014).

party on the claim or claims at issue.[32]  A "scintilla of evidence" supporting the

nonmovant's position is insufficient; "there must be evidence on which the jury

could reasonably find for the [nonmovant]."[33]  Succinctly stated, summary

judgment is "put up or shut up time" for the nonmoving party.[34]

## III.   DISCUSSION

At the outset, the Court notes that Travillion, through his shotgun-style

pleading, obscures and commingles his claims, often attempting to assert that a

single action violated a plethora of constitutional rights.  The Court, therefore,

must attempt to determine what specific claims Travillion is asserting, which

Defendants the different claims target, and whether Travillion has carried his Rule

56 burden as to any of those claims.  Before that complicated process can be

accomplished, however, the Court must first address the lack of personal

involvement for multiple named Defendants.

### A.   Personal Involvement

It is well established that, in Section 1983 actions, liability cannot be

"predicated solely on the operation of *respondeat superior*."[35]  Rather, a Section

---

[32]   *Liberty Lobby*, 477 U.S. at 250-57; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-89 (1986).

[33]   *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Liberty Lobby*, 477 U.S. at 252) (alteration in original).

[34]   *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 391 (3d Cir. 2017) (quoting *Berkeley Inv. Grp. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006)).

[35]   *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (citations omitted); *see also Ashcroft v. Iqbal*, 556. U.S. 662, 676 (2009) (affirming same principle in *Bivens* context).

1983 plaintiff must aver facts that demonstrate "the defendants' personal involvement in the alleged misconduct."[36]  Personal involvement can include direct wrongful conduct by a defendant, but it can also be demonstrated through allegations of "personal direction" or of "actual knowledge and acquiescence"; however, such averments must be made with particularity.[37]  Furthermore, it is equally well-settled that involvement in the post-incident grievance process alone does not give rise to Section 1983 liability.[38]

In Travillion's amended complaint, he repeatedly pleads in the following format: "on X date, Defendant __, individually and in concert and conspiracy with Defendants __, __, __, [various named Defendants] and other SCI-Rockview administration and staff, pursuant to a long standing [sic] policy, practice, custom and culture of arbitrary and malicious obstruction, censorship, confiscation, destruction and otherwise unlawful interference with incoming inmate mail divorced from any rational or legitimate penological interest," purportedly took a certain unlawful action.  For example, in paragraph 34, Travillion alleges,

---

[36]  *Dooley*, 957 F.3d at 374 (citing *Rode*, 845 F.2d at 1207).
[37]  *Id.* (quoting *Rode*, 845 F.2d at 1207).
[38]  *See Dooley*, 957 F.3d at 374 (affirming dismissal of claims against prison officials for lack of personal involvement when officials' "only involvement" was "their review and denial of [plaintiff]'s grievance"); *Lewis v. Wetzel*, 153 F. Supp. 3d 678, 696-97 (M.D. Pa. 2015) (collecting cases); *Brooks v. Beard*, 167 F. App'x 923, 925 (3d Cir. 2006) (nonprecedential); *Alexander v. Gennarini*, 144 F. App'x 924, 925 (3d Cir. 2005) (nonprecedential) (explaining that prisoner's claims against certain defendants were "properly dismissed" because the allegations against them "merely assert their involvement in the post-incident grievance process").

On November 20th, 2017[,] Defendant McMahon, individually *and in concert and conspiracy with* Defendants Garman, Beck, Boone, Probst, Vance and other SCI-Rockview administration and staff, pursuant to a long standing [sic] policy, practice, custom and culture of arbitrary and malicious obstruction, censorship, confiscation, destruction and otherwise unlawful interference with incoming inmate mail divorced from any rational or legitimate penological interest intercepted, inspected and rejected a correspondence forwarded to Plaintiff from life long [sic] friend, Author Ford, and suspended Plaintiff's special approval to correspond with Mr. Ford[.]"[39]

Notably, however, Travillion's conspiracy claims were dismissed at the Rule 12(b)(6) stage for failing to plausibly allege any civil rights conspiracy.[40] Consequently, in paragraph 34, the only plausible personal involvement regarding an alleged First Amendment violation is that of McMahon. None of the other Defendants named in this paragraph (or other similar paragraphs) are plausibly alleged to have been involved in the mail interference or retaliation.

Thus, when reviewing paragraphs 31 through 50 (the First Amendment free-speech mail interference claims), Travillion has only plausibly alleged personal involvement for the following Defendants: John Doe #1, John Doe #2, John Doe #3, McMahon, Boone, John Doe #4, John Doe #5, Wetzel, the DOC, and Smart Communications.[41] The "John Doe" defendants have been identified as Boone, Caprio, Harpster, Walters, and Wilson,[42] but neither Travillion nor Defendants

---

[39] Doc. 32 ¶ 34 (emphasis supplied).
[40] *See* Doc. 81 at 23-27, 29.
[41] *See id.* ¶¶ 31-50.
[42] *See* Docs. 41, 42.

have specified which Doe defendant is affiliated with which Doe number in the amended complaint.[43]  Travillion has thus failed to plausibly allege personal involvement for the First Amendment mail interference claims as to defendants Garman, Beck, Probst, Vance, and Sherman, so any such claim against them must be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim.

The same reasoning applies to Travillion's First Amendment retaliation claims.  The only defendants for which Travillion plausibly pleads personal involvement (*i.e.*, taking allegedly unlawful action) are Boone, McMahon, John Doe #4, Stabley, Cox, Paul, Rossman, Loaner, and Chase.[44]  And—because the parties have failed to properly identify the Doe defendants—Caprio, Harpster, Walters, and Wilson must be included in this list, as it is unknown which of the Doe defendants is "John Doe #4."  Consequently, the First Amendment retaliation claims against Garman, Beck, Probst, Vance, and Rogers must also be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim due to lack of personal involvement.

Therefore, because Travillion did not plausibly plead personal involvement in either of the remaining First Amendment claims for Garman, Beck, Probst,

---

[43]  *See* Doc. 53 at 12 & n.1.
[44]  *See* Doc. 32 ¶¶ 34-36, 52-53, 56-60.

Vance, Sherman, or Rogers, these Defendants must be dismissed from this case.[45]
The Court now turns to the specific causes of action.

### B.     First Amendment Retaliation

Although a prisoner's constitutional rights are necessarily circumscribed, an
inmate still retains First Amendment protections when they are "not inconsistent"
with prisoner status or with the "legitimate penological objectives of the
corrections system."[46]  To state a First Amendment retaliation claim, a plaintiff
must plausibly plead that (1) "he was engaged in constitutionally protected
conduct," (2) he suffered an "adverse action" by prison officials sufficient to deter
a person of ordinary firmness from exercising his First Amendment rights, and
(3) the plaintiff's protected conduct was a "substantial or motivating factor" in the
prison officials' decision to take the adverse action.[47]  This third element is often
referred to as "causation."

There are a variety of ways to prove causation for a First Amendment
retaliation claim.  One method is to show "unusually suggestive" timing between
the protected conduct and the adverse action.[48]  When a plaintiff relies solely on

---

[45]  *See* 28 U.S.C. § 1915(e)(2)(B)(ii) (providing that court "shall dismiss" a claim or action "*at
   any time* if the court determines that . . . the action or appeal . . . fails to state a claim on which
   relief may be granted" (emphasis supplied)).
[46]  *Wisniewski v. Fisher*, 857 F.3d 152, 156 (3d Cir. 2017) (quoting *Newman v. Beard*, 617 F.3d
   775, 781 (3d Cir. 2010)).
[47]  *Id.* (quoting *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001)); *Mitchell v. Horn*, 318 F.3d
   523, 530 (3d Cir. 2003) (quoting *Rauser*, 241 F.3d at 333).
[48]  *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

circumstantial evidence of temporal proximity at summary judgment, the time

between the protected conduct and the adverse action is often measured in days

rather than weeks or months.[49]  However, there is no "bright line rule limiting the

length of time that may pass between a plaintiff's protected speech and an

actionable retaliatory act by a defendant."[50]  Another approach is to demonstrate "a

pattern of antagonism coupled with timing."[51]  Finally, causation can be inferred

"from the evidence gleaned from the record as a whole."[52]  Logically, a plaintiff

asserting retaliation "will have to show . . .  that the decision maker had knowledge

of the protected activity[.]"[53]

　　　Travillion contends that the following retaliatory actions were taken against

him:

- November 17, 2017 – McMahon rejected correspondence from Travillion's friend Arthur Ford and suspended special approval to correspond with Ford in retaliation for filing grievances referenced in paragraphs 31, 32, and 33 of the amended complaint.[54]

- November 2017 to January 2018 – Boone confiscated and destroyed mailings from "Thru the Bible Ministries" in retaliation for filing grievances referenced in paragraphs 31, 32, and 33 of the amended complaint. [55]

---

[49]  *See Conard v. Pa. State Police*, 902 F.3d 178, 184 (3d Cir. 2018).

[50]  *Id.*

[51]  *DeFlaminis*, 480 F.3d at 267.

[52]  *Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)).

[53]  *Moore v. City of Philadelphia*, 461 F.3d 331, 351 (3d Cir. 2006) (citation omitted).

[54]  Doc. 32 ¶ 34.

[55]  *Id.* ¶ 35.

- January 3, 2018 – John Doe #4 rejected mail sent from Travillion's mother, Ernestine Travillion, in retaliation for filing grievances referenced in paragraphs 31, 32, and 33 of the amended complaint. [56]

- January 18, 2017 – Stabley "confiscated, damaged, destroyed or otherwise converted" Travillion's personal property in retaliation for filing both *Travillion v. Wetzel*, No. 14-cv-1159 (M.D. Pa. 2014), and the grievance referenced in paragraph 31 of the amended complaint.[57]

- May 31 to June 16, 2017 – Cox "confiscated, damaged, destroyed or otherwise converted" Travillion's personal property in retaliation for filing *Travillion v. Wetzel*, No. 14-cv-1159, and for cooperating in *Jacobs v. O'Keefe*, No. 2:08-cv-470 (W.D. Pa. 2008).[58]

- June 7 to June 12, 2017 – Paul interfered with Travillion's video testimony in *Jacobs v. O'Keefe* and "converted [Travillion's] personal and legal effects" in retaliation for cooperating in *Jacobs v. O'Keefe* and for "other protected petition, speech and civil rights activities[.]"[59]

- November 15, 2017 – Rossman fabricated and issued misconduct report #C 112157 against Travillion for filing and prosecuting *Travillion v. Wetzel*, No. 14-cv-1159, and for "other protected petition, speech and civil rights activities[.]"[60]

- January 15, 2018 – Loaner fabricated and issued misconduct report #D 094992 against Travillion for filing and prosecuting *Travillion v. Wetzel*, No. 14-cv-1159, and for "other protected petition, speech and civil rights activities[.]"[61]

- January 23, 2018 – Chase "expelled" Travillion from the law library on a single occasion in retaliation for filing and prosecuting *Travillion v.*

---

[56] *Id.* ¶ 36.
[57] *Id.* ¶ 52.
[58] *Id.* ¶ 53.
[59] *Id.* ¶ 56.
[60] *Id.* ¶ 57.
[61] *Id.* ¶ 58.

*Wetzel*, No. 14-cv-1159, and for "other protected petition, speech and civil rights activities[.]"[62]

- February 14, 2018 – Chase "searched and read" Travillion's legal work and "warned him to scale back his legal activities or suffer unspecified consequences" in retaliation for filing and prosecuting *Travillion v. Wetzel*, No. 14-cv-1159, and for filing a grievance related to the January 23 expulsion from the library.[63]

Upon careful review of the above claims and the Rule 56 record, the Court finds that, for nearly all of Travillion's retaliation claims, he has failed to establish causation.

First, Travillion alleges that McMahon, Boone, and John Doe #4 (which could be Boone, Caprio, Harpster, Walters, or Wilson) retaliated against him for filing grievances related to the conduct alleged in paragraphs 31, 32, and 33 of the amended complaint. He additionally claims that Stabley retaliated against him for filing a grievance based on the conduct alleged in paragraph 31. The parties agree that the referenced grievance numbers are 650697, 664739, and 670819.[64] None of these grievances or their appeals (or the DOC responses thereto) target, name, or involve McMahon, Boone, Caprio, Harpster, Walters, Wilson, or Stabley.[65]

Moreover, out of the seven foregoing Defendants, it appears that only Boone took part in the administrative process for any of the at-issue grievances when he

---

[62] *Id.* ¶ 59.
[63] *Id.* ¶ 60.
[64] Doc. 139 ¶ 19; Doc. 174 ¶ 19; *see also* Doc. 141-14 at 1-47, Travillion Dep. 32:14-20 [hereinafter "Travillion Dep. __:__"].
[65] *See* Doc. 141-3; Doc. 141-4; Doc. 141-10.

rejected Travillion's initial grievance in number 650697.[66]  But Boone's

participation in responding to Travillion's grievance only underscores the fact that

the grievance did not target or involve him, as DC-ADM 804 does not permit any

prison official named or involved in the subject of a grievance to participate in the

related administrative resolution process.[67]

Travillion, therefore, has failed to demonstrate that any of the foregoing

Defendants other than Boone even had knowledge of the at-issue grievances.

Moreover, assuming they did, Travillion has not established why they would

retaliate against him for filing the grievances.  Courts in this district have

consistently rejected retaliation claims against one defendant based on a grievance

filed against a different defendant or nonparty prison official,[68] as such conclusory

allegations do not show knowledge of the protected conduct or establish

causation.[69]

---

[66]  *See* Doc. 141-3 at 4.

[67]  *See* COMM'W. OF PA., DEP'T OF CORR., *Policy Statement* DC-ADM 804: Inmate Grievance System, §§ 1(C)(3), 2(A)(2)(a) (May 1, 2015).

[68]  *See, e.g.*, *Kendrick v. Hann*, No. 1:19-cv-01642, 2021 WL 2914986, at *9 (M.D. Pa. July 12, 2021); *Murray v. Smithbower*, No. 1:17-cv-0127, 2021 WL 1103524, at *7 (M.D. Pa. Mar. 23, 2021); *Horan v. Collins*, No. 1:13-cv-00140, 2016 WL 5030468, at *6 (M.D. Pa. Aug. 8, 2016); *Victor v. Lawler*, No. 3:07-cv-2058, 2010 WL 5014555, at *5 (M.D. Pa. Dec. 3, 2010); *Royster v. Beard*, No. 1:06-cv-0842, 2008 WL 2914516, at *6 (M.D. Pa. July 24, 2008) (concluding that plaintiff failed to satisfy the causal connection for his retaliation claim against defendant because previous grievance did not name or impact that defendant), *aff'd* 308 F. App'x 576 (3d Cir. 2009) (nonprecedential) (agreeing with district court analysis).

[69]  The Court additionally notes that the "adverse actions" for these claims—interference with mail on a single occasion by each Defendant—likely does not rise to the level of an actionable adverse action for a retaliation claim.  *See Huertas v. Sobina*, 476 F. App'x 981, 984 (3d Cir. 2012) (nonprecedential) (finding that interference with inmate's personal mail—including taking photographs from personal letters, interfering with receipt of a magazine subscription

Second, Travillion alleges that Stabley, Cox, Paul, Rossman, Loaner, and Chase retaliated against him for filing and prosecuting *Travillion v. Wetzel*, No. 14-cv-1159 (M.D. Pa. 2014), and for cooperating in *Jacobs v. O'Keefe*, No. 2:08-cv-470 (W.D. Pa. 2008).  However, it is undisputed that *none* of the Defendants in the instant case were sued, much less served, in these unrelated 2008 and 2014 civil lawsuits.[70]  Travillion has proffered absolutely no evidence that would establish knowledge of the protected conduct, let alone why these lawsuits would motivate Defendants to take adverse actions against him.  His bald, unsupported assertion that "the DOC Defendants[] were certainly aware of the litigation at the time the adverse actions were taken"[71] is pure speculation, which cannot create a genuine dispute of material fact regarding knowledge of the protected conduct.[72]  Furthermore, even if Travillion had proffered evidence demonstrating that the foregoing Defendants had knowledge of the unrelated 2008 and 2014 lawsuits, he has not established why they would retaliate against him for this litigation.

Additionally, as to Paul, Rossman, Loaner, and Chase, Travillion vaguely alleges that they also retaliated against him based on "other protected petition,

---

and related correspondence, interfering with letters to and from a pen pal service, and confiscating and returning funds sent by relatives—were "not sufficiently adverse to deter a person of ordinary firmness" from exercising First Amendment rights).

[70]  *See* Doc. 139 ¶¶ 46-47; Doc. 174 ¶¶ 46-47.
[71]  Doc. 177 at 13.
[72]  *See El v. SEPTA*, 479 F.3d 232, 238 (3d Cir. 2007) ("The non-moving party cannot rest on mere pleadings or allegations; rather it must point to actual evidence in the record on which a jury could decide an issue of fact its way.").

speech and civil rights activities."[73]  These ambiguous and conclusory allegations, which lack plausibility and specificity, do not even satisfy minimum pleading requirements, much less meet Travillion's Rule 56 burden.

In his responsive statement of facts, Travillion broadly asserts that "the retaliation [by Stabley, Cox, Paul, Rossman, Loaner, and Chase] was motived by more than just the 2014 litigation."[74]  Yet he does not support this assertion with any competent evidence.  He largely points to his own amended complaint and grievances,[75] but these documents are comprised of mere allegations, which are insufficient at summary judgment.[76]

The only documents to which Travillion cites that do not consist entirely of his own allegations are several affidavits from other prisoners.[77]  Yet these affidavits do not provide any support for causation in the instant case.  The affidavit by John D. Wilson deals primarily with a 2013 sexual assault of a

---

[73]  *See* Doc. 32 ¶¶ 56-59.

[74]  Doc. 174 ¶ 46.

[75]  *See id.* ¶¶ 46-48, 50.

[76]  *See El*, 479 F.3d at 238; *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 288-89 (3d Cir. 2018) (explaining that, at summary judgment, "the non-moving party must oppose the motion and, in doing so, may not rest upon the mere allegations or denials of his pleadings but, instead, must set forth specific facts showing that there is a genuine issue for trial.  Bare assertions, conclusory allegations, or suspicions will not suffice." (alteration omitted) (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268-69 (3d Cir. 2014))).

[77]  *See* Doc. 174 ¶¶ 46-47 (citing Doc. 71 at 3-6 ¶¶ 5-16; Doc. 112-1 at 9 ¶ 26; Doc. 116-1 at 4-5 ¶¶ 7-11).  Travillion also cites, without explanation or description, "Bates Nos. 522-603, 637-723" contained in ECF Document 167.  *See* Doc. 174 ¶ 46.  The Court declines to review over 160 pages of discovery material without any direction, explanation, or reason from Travillion.  Moreover, even a cursory scan of this material indicates that it consists of previous grievances filed years before the events underlying the instant lawsuit, providing no support for causation in the case at bar.

nonparty inmate and avers that defendant Rogers retaliated against Wilson for reporting the assault.[78]  In one paragraph (the single paragraph Travillion cites), Wilson attests that Rogers informed him that he told the RHU staff to keep Travillion "in the hole" for Christmas without justification in retaliation for Travillion's jailhouse-lawyer activities.[79]  But Rogers is being dismissed from this case for lack of personal involvement, and even if he were not, these allegations of retaliation do not appear anywhere in the amended complaint.[80]  Further, paragraph 26 of Wilson's affidavit does not contain any dates, rendering it too vague to be of assistance in the instant case.

The affidavit of Kristian Diaz-Cruz is similarly unhelpful.  Again, this affidavit deals with defendant Rogers,[81] who must be dismissed for lack of personal involvement.  Diaz-Cruz avers that Rogers retaliated against him for filing a lawsuit (with Travillion's help) and made statements implying that he was going to retaliate against Travillion for assisting Diaz-Cruz.[82]  Once again, this affidavit provides no support for Travillion's allegations against the remaining Defendants that he was subjected to retaliation for filing grievances, for filing and

---

[78]  *See generally* Doc. 112-1 at 2-10.

[79]  *See id.* at 9 ¶ 26.

[80]  *See Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008) (nonprecedential) (explaining that a plaintiff cannot amend his pleadings through a brief in opposition to a motion for summary judgment) (citations omitted).

[81]  *See generally* Doc. 116-1 at 1-6.

[82]  *See id.*

prosecuting *Travillion v. Wetzel*, No. 14-cv-1159, or for cooperating in *Jacobs v. O'Keefe*.

Finally, Travillion cites to several paragraphs in an affidavit by Craig Saunders.[83]   In these paragraphs, Saunders avers that he witnessed Travillion's law-library expulsion that occurred on January 23, 2018 (appearing in Travillion's amended complaint at paragraph 59).[84]   While this affidavit lends support to Travillion's allegations about being expelled by Chase from the law library on January 23, it does nothing to establish causation for the retaliation claim.   In other words, it does not demonstrate why Travillion's protected conduct of filing a lawsuit in 2014 against different prison officials was a substantial or motivating factor for Chase's alleged retaliatory conduct.   To the extent that paragraph 13 of the affidavit touches on causation, the averments by Saunders therein simply repeat allegations told to him by Travillion.[85]   The statements in this paragraph are not made on "personal knowledge," do not "set out facts that would be admissible in evidence," and do not show that Saunders "is competent to testify on the matters

---

[83]   *See* Doc. 174 at 15 ¶¶ 46, 47 (citing Doc. 71 at 3-6 ¶¶ 5-16).

[84]   *See* Doc. 71 at 3-6 ¶¶ 5-16.

[85]   *See id.* at 5 ¶ 13 ("Travillion told me that Officer Chase and other staff had been harassing him for months over a lawsuit he filed.  He said that ever since a motion to dismiss filed by the jail was denied by the court, staff had been harassing him more and more over the case as it progressed.  He told me that he was actually on cell restriction due to a misconduct issued against him in retaliation for filing and prosecuting the lawsuit.").

stated."[86]  Thus, Saunders' affidavit does not provide competent evidence of causation for any of the remaining retaliation claims, either.

Third, and last, is Travillion's retaliation claim against Chase in paragraph 60 of the amended complaint.  Travillion alleges that Chase retaliated against him for filing a grievance related to the January 23 expulsion from the law library.[87]  At first blush, the temporal proximity between the filing of the grievance (on February 12, 2018) and the alleged adverse action (on February 14, 2018) appears unusually suggestive and may implicate a causal connection.  However, on closer inspection, the at-issue grievance (number 721521), although dated and presumably filed on February 12, 2018, was not received by the Facility Grievance Coordinator until February 15, 2018, a day *after* the alleged retaliation by Chase.[88]  Even if Chase was notified the very same day the Facility Grievance Coordinator received the grievance (*i.e.*, February 15), logic dictates that there can be no causal connection if the purported adverse action predates knowledge of the protected conduct.

Alternatively, presuming Travillion has done enough to show causation on this claim, it fails because the alleged adverse action is not sufficient to deter a person of ordinary firmness from exercising his First Amendment rights.

---

[86]  FED. R. CIV. P. 56(c)(4).

[87]  Travillion also alleges that Chase retaliated against him for filing *Travillion v. Wetzel*, No. 14-cv-1159, (*see* Doc. 32 ¶ 60), but the absence of causation with respect to this unrelated lawsuit has already been fully explained above.

[88]  *See* Doc. 67 at 18.

Travillion asserts that the adverse action taken by Chase on February 14 was that he "searched and read" Travillion's legal work and "warned [Travillion] to scale back his legal activities or suffer unspecified consequences."[89]  But inmates do not possess Fourth Amendment protections from property searches,[90] and mere verbal threats alone, especially "unspecified" ones, generally do not constitute actionable adverse actions.[91]

In sum, Travillion has failed to establish causation for any of his retaliation claims.  And the single claim where there may possibly exist a dispute of fact as to causation lacks the requisite adverse action.  Accordingly, summary judgment

---

[89]  Doc. 32 ¶ 60.

[90]  *See Hudson v. Palmer*, 468 U.S. 517, 530 (1984); *Doe v. Delie*, 257 F.3d 309, 316 (3d Cir. 2001) ("The *Hudson* court confirmed that a Fourth Amendment right to be free from unreasonable searches and seizures is inconsistent with incarceration."); *see also Humphrey v. Sec'y Pa. Dep't of Corr.*, 712 F. App'x 122, 125 (3d Cir. 2017) (nonprecedential) (holding that seizure of legal materials did not state a cognizable Fourth Amendment claim) (citing *Hudson*, 468 U.S. at 536).

[91]  *See Dunbar v. Barone*, 487 F. App'x 721, 723 (3d Cir. 2012) (nonprecedential) (finding that "verbal threats and few gestures of racial harassment" plaintiff experienced were "not sufficiently adverse to support a retaliation claim" under the facts of that case); *Burgos v. Canino*, 358 F. App'x 302, 306 (3d Cir. 2009) (nonprecedential) (noting that "threats alone do not constitute retaliation") (citing *Maclean v. Secor*, 876 F. Supp. 695, 699 (E.D. Pa. 1995) (collecting cases)); *Snider v. Alvarez*, No. 18-cv-801, 2020 WL 6395499, at *17 & n.166 (M.D. Pa. Nov. 2, 2022) (collecting cases); *Cooper v. Sherman*, No. 17-cv-2064, 2019 WL 2408973, at *7 (M.D. Pa. June 7, 2019) ("It is well settled, however, that verbal threats or verbal harassment . . . do not constitute adverse action for purposes of establishing a First Amendment retaliation claim."); *Bartelli v. Lewis*, No. 04-cv-908, 2005 WL 2406048, at *2 (M.D. Pa. Sept. 29, 2005) ("[V]erbal threats do not constitute an 'adverse action' and, therefore, do not fulfill a requisite element of a retaliation claim[.]"); *see also Naranjo v. Walter*, No. 22-3435, 2023 WL 5928506, at *3 (3d Cir. 2023) (nonprecedential) (finding that threat to issue misconduct if inmate filed unfounded sexual abuse claim was insufficient to establish an adverse action for retaliation claim); *Chruby v. Kowaleski*, 534 F. App'x 156, 161 (3d Cir. 2013) (nonprecedential) (finding that verbal threat to issue misconduct did not sufficiently state an adverse action for retaliation claim).

must be granted in Defendants' favor on all remaining First Amendment retaliation claims.

## C.   First Amendment Free-Speech Claims

Travillion's First Amendment free-speech interference claims are no less commingled and ambiguous.  As best as the Court can ascertain, Travillion is attempting to assert three different types of free-speech claims with respect to his prison mail: (1) a free-speech interference claim concerning the handling of his incoming personal mail; (2) a free-speech "pattern and practice" claim involving his legal mail; and (3) alleged unconstitutional DOC policies involving his legal mail.[92]

### 1.   Interference with Incoming Personal Mail

Travillion makes the following allegations regarding personal mail:

- October 26, 2016 – John Doe #1 opened and inspected mail from the White House and allegedly removed and confiscated (or destroyed) some of the contents of that package before giving it to Travillion.[93]

- November 20, 2017 – McMahon inspected and rejected correspondence from former inmate Arthur Ford and suspended Travillion's special approval to correspond with Ford.[94]

- November 2017 to January 2018 – Boone confiscated and destroyed monthly newsletters and bible study materials from Thru the Bible Ministries.[95]

---

[92]   *See* Doc. 81 at 11-13; Doc. 32 ¶¶ 31-50.
[93]   Doc. 32 ¶ 31; Doc. 174 ¶ 15; Doc. 177 at 7-8.
[94]   Doc. 32 ¶ 34.
[95]   *Id.* ¶ 35.

- January 3, 2018 – John Doe #4 improperly rejected a mailing from Travillion's mother, Ernestine Travillion.[96]

Travillion's amended complaint, in its "kitchen-sink" approach to litigation, repeatedly alleges that all mail was interfered with "pursuant to a long standing [sic] policy, practice, custom and culture of arbitrary and malicious obstruction, censorship, confiscation, destruction and otherwise unlawful interference with incoming mail" present at SCI Rockview.[97]  In this way, Travillion never identifies whether he is challenging a specific DOC regulation or policy, or whether he is simply claiming that there was an informal custom or practice of unconstitutional censorship of incoming mail.  Travillion's ambiguous catchall pleading, therefore, makes it nearly impossible to identify the contours of his First Amendment free speech claims and, concomitantly, to determine whether they survive Rule 56 scrutiny.

For example, it remains unclear (even at this stage of the litigation) what type of free-speech claim Travillion is asserting with respect to his personal mail. Travillion never clarifies this claim in his amended complaint or in his summary judgment briefing, nor does he point to a specific DOC regulation or policy. Normally, a restriction or censorship on incoming personal mail will involve an across-the-board policy or regulation and will thus be analyzed under *Turner v.*

---

[96] *Id.* ¶ 36.
[97] *See id.* ¶¶ 31-50.

*Safley*, 482 U.S. 78 (1987).  But Travillion seems to be asserting that, on six occasions over the span of fourteen months, his personal mail was interfered with in different ways by different prison officials for no legitimate reason.

Inmates retain a First Amendment right to send and receive personal mail.[98] That right, like other constitutional rights in the prison context, is not absolute, as prison administrators must "strike a delicate balance" between "order and security of the internal prison environment" and the "legitimate demands of those on the 'outside' who seek to enter that environment . . . through the written word."[99] Thus, while a single instance of interference with incoming mail generally does not amount to a constitutional violation,[100] repeated interference or censorship (*i.e.*, withholding delivery of incoming correspondence) without a legitimate penological purpose may violate an inmate's First Amendment rights.[101]

The gravamen of Travillion's personal mail claim is that his incoming mail was censored for no legitimate purpose (and, as discussed above, allegedly in retaliation for filing grievances).  For the following reasons, Defendants' response is insufficient to warrant summary judgment in their favor on this claim.

---

[98]  *See Jones v. Brown*, 461 F.3d 353, 358 (3d Cir. 2006).

[99]  *Thornburg v. Abbott*, 490 U.S. 401, 407 (1989).

[100] *See Bieregu v. Reno*, 59 F.3d 1445, 1452 (3d Cir. 1995), *abrogated on other grounds by Lewis v. Casey*, 518 U.S. 343 (1996).

[101] *See id.*; *Parrish v. Johnson*, 800 F.2d 600, 604 (6th Cir. 1986); *see also Van den Bosch v. Raemisch*, 658 F.3d 778, 785 (7th Cir. 2011) (noting that prison officials may impose restrictions on inmate correspondence if those restrictions "are reasonably related to legitimate penological interests" (quoting *Turner*, 482 U.S. at 89)).

Defendants first contend that there is no evidence that the White House mailing was tampered with or missing contents. But Travillion has proffered evidence showing that the mailing was sent in an oversized envelope with a postage amount of $1.36 (more than the cost of mailing a single-page letter) and stated "do not bend" on the envelope, indicating that the package contained more than the President's letter and possibly included a photograph or other documents.[102] During the grievance process, the DOC never put forward any reason why a portion of the mailing would be confiscated or censored; instead it flatly denied that any contents were missing (despite evidence to the contrary).[103] Defendants essentially parrot that denial in their Rule 56 briefing.

Next, Defendants assert that McMahon's rejection of incoming mail from Arthur Ford is obviated by Travillion's failure to grieve the issue. Notably, Defendants do not claim that the censorship did not occur. Travillion contends that he did file a grievance related to this issue and he received no response.[104] The portion of the record to which he cites, however, does not contain a copy of the grievance he maintains that he filed.[105] Nevertheless, even if Travillion did not grieve this particular incident, it does not subvert his entire claim regarding his

---

[102] *See* Doc. 167-1 at 90, 95.
[103] *See* Doc. 141-3 at 1.
[104] *See* Doc. 174 ¶ 20.
[105] *See id.* (citing Doc. 66-5 at 1, Doc. 67 at 1-2). No grievance related to the Arthur Ford mail censorship is contained in these pages or any of those that surround them.

personal mail.  Furthermore, Defendants have not proffered an explanation or reason why McMahon rejected the mail from Ford and rescinded Travillion's permission to correspond with him.

With respect to the monthly mailings from Thru the Bible Ministries, Defendants once again offer no explanation for why these mailings were censored. And, while it is true that Travillion's grievance about this issue was denied on procedural grounds for failing to specify the dates of the rejected correspondence,[106] he provides a convincing rebuttal: he could not identify the exact dates of the mailings or when they were refused if he never received them (or notice of their rejection) in the first place.

Finally, Travillion alleges that a letter from his mother, Ernestine Travillion, was improperly rejected in January 2018.  During the initial grievance review, the DOC asserted that the mailing was rejected because it was an unopened "box" and, under DC-ADM 803, a "package from individual [sic] unopened will be refused and returned to sender."[107]  No provision of DC-ADM 803 is cited to support this explanation.[108]

In his first-level appeal, Travillion noted that the letter was not mailed in a "box" and even provided the certified tracking number for the envelope.[109]  The

---

[106] *See* Doc. 67 at 14.
[107] Doc. 141-6 at 3.
[108] *See id.*
[109] *See id.* at 4.

Facility Manager denied the appeal based primarily on the reasoning of the initial grievance denial.[110]

On final appeal, the DOC's rationale changed.  For the first time, the Chief Grievance Officer asserted that the letter was refused because Travillion's mother had written "E. Travillion" in her return address rather than using her full name.[111] The Officer quoted an unspecified section of DC-ADM 803, stating that incoming mail must have "a return address consisting of the **sender's name**" and street address.[112]  The Officer then asserted that "E. Travillion" was not the sender's "complete name as required by policy."[113]  Yet the quoted provision does not say that the return address must contain the sender's *complete* name; it simply says it must include "the sender's name."[114]  Both the shifting rationales and the unconvincing policy-related justification lend credence to Travillion's contention that this personal letter was improperly rejected without any legitimate basis.

Travillion has put forth evidence that his personal incoming mail was tampered with or refused on multiple occasions during a fourteen-month period. Defendants have not proffered any legitimate penological explanations (rooted in policy or circumstances) for much of this censorship.  In the one instance where a

---

[110]  *See id.* at 5.
[111]  *See id.* at 1.
[112]  *See id.* (emphasis in original).
[113]  *See id.*
[114]  *See id.*

policy-based justification is given, that explanation changed during the grievance appeal process, and the final rationale provided does not appear to be supported by the cited language of DC-ADM 803.  Summary judgment, therefore, must be denied on this claim as to defendants McMahon, Boone, Caprio, Harpster, Walters, and Wilson.[115]

## 2.    Legal Mail – Pattern and Practice

Travillion also maintains that Defendants violated his First Amendment rights with respect to his legal mail.  Once again, however, his amended complaint is nearly impossible to decipher with respect to the contours of his legal mail claims.  The Court will first examine Travillion's allegations that appear to be unrelated to any institutional policy and thus may fairly be presumed to assert a "pattern and practice" violation based on officials' actions rather than an explicit DOC policy.  Travillion alleges the following:

- January 24, 2017 – John Doe #2 "intercepted and rejected" tax return documents mailed from the Allegheny County Controller's Office without giving Travillion notice or an opportunity to challenge the rejection.[116]

- February 28, 2017 – John Doe #3—outside of Travillion's presence—"intercepted and inspected" the tax documents initially rejected on January 24 that had been remailed from the Allegheny County Controller's Office.[117]

---

[115] As explained above, either Boone, Caprio, Harpster, Walters, or Wilson could be John Doe #1 in paragraph 31 or John Doe #4 in paragraph 36.

[116] Doc. 32 ¶ 32.

[117] *Id.* ¶ 33.

- July 2, 2018 – John Doe #5—outside of Travillion's presence—"intercepted and inspected" legal mail forwarded to Travillion from the Allegheny County Department of Court Records, Criminal Division.[118]

The Third Circuit has recognized that inmates have a First Amendment free-speech right in confidentiality with regard to attorney-client communication and court mail.[119] Thus, when there is a "pattern and practice . . . of opening legal mail outside the presence of the addressee inmate," it "interferes with protected communications, strips those protected communications of their confidentiality, and accordingly impinges upon the inmate's right to freedom of speech."[120] There does not need to be an independent injury to assert such a First Amendment claim, as "protection of an inmate's freedom to engage in protected communications is a constitutional end in itself."[121]

With respect to the first two incidents, the record evidence indicates that the mailings were either rejected or opened outside of Travillion's presence by mistake. As to the January 24, 2017 correspondence, that mail was sent by the Allegheny County Controller's Office (rather than an attorney or court), stated that a "tax return document" was enclosed, and did not include Travillion's inmate

---

[118] *Id.* ¶ 37.
[119] *Jones v. Brown*, 461 F.3d 353, 358-59 (3d Cir. 2006).
[120] *Id.* at 359.
[121] *Id.* at 360.

number or a court control number.[122]  The February 28, 2017 correspondence also came from the Controller's Office and did not contain a court control number.[123]

In response to Travillion's grievance about these mailings, the Facility Manager first conceded that, although the correspondence lacked certain identifiers, the mail should have been considered legal mail and opened in Travillion's presence "because the return address is a listed courthouse."[124]  The Facility Manager further advised, however, that this mistake was "simply staff error and interpretation of policy" and that the mailroom staff had been advised of the proper procedure for processing correspondence sent from a courthouse.[125]

Approximately a year and a half later, John Doe #5 allegedly opened correspondence from the Allegheny County Department of Court Records outside of Travillion's presence.  Defendants have provided no specific reason for this mail being opened outside of Travillion's presence, and his related grievance was ultimately denied on timeliness grounds rather than on the merits.[126]

In view of the foregoing, no reasonable juror could find that there was a "pattern and practice" of interference with Travillion's legal mail unrelated to a specific DOC policy.  To the extent that the first two mailings can even be

---

[122] *See* Doc. 66-3 at 7, 10.
[123] *See id.* at 6.
[124] *See id.* at 10.
[125] *See id.*
[126] *See* Doc. 141-7 at 1, 5.

considered legal mail (as they were tax documents mailed by the Controller's Office),[127] these two incidents contain all the hallmarks of an honest mistake by mailroom employees: the correspondence appeared to be (and in fact was) tax documents rather than mail from an attorney or court, did not contain court control numbers that would give the mailroom employee notice of legal mail, and the initial mailing did not even include Travillion's inmate number.[128]

The July 2, 2018 incident, although more problematic because the mail was labeled as being from a court, was a year and a half removed from the other two incidents and thus lacks any suggestion or inference of a "pattern" or "practice" of legal mail interference.  Moreover, even if this incident constituted mishandling of Travillion's legal mail, a single incident alone does not implicate a constitutional violation.[129]  Summary judgment will be granted in Defendants' favor as to any

---

[127]  Under the version of DC-ADM 803 in effect at that time, tax documents mailed to an inmate were "not [to] be delivered to an inmate, as the[y] may be used to file fraudulent tax returns." DC-ADM 803 § 2(A)(4) (2015).  Instead, inmates were required to request the proper forms from their Unit Management Team.  *Id.*

[128]  *See, e.g.*, *Hale v. Pa. Dep't of Corr.*, No. 3:07-cv-0345, 2010 WL 3791833, at *3 (M.D. Pa. Sept. 16, 2010) (noting that two instances of inadvertent opening of legal mail outside of inmate's presence "is nothing more than an assertion of negligence" and does not state a "pattern and practice" First Amendment claim) (collecting cases).

[129]  *See Jones*, 461 F.3d at 359 (requiring a pattern and practice of opening legal mail outside of prisoners' presence); *Bieregu v. Reno*, 59 F.3d 1445, 1452 (3d Cir. 1995) ("We decline to hold that a single instance of damaged mail rises to the level of constitutionally impermissible censorship."), *abrogated on other grounds by Lewis v. Casey*, 518 U.S. 343 (1996); *Iwanicki v. Pa. Dep't of Corr.*, 582 F. App'x 75, 79 (3d Cir. 2014) (nonprecedential) (citing *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003)); *Fortune v. Hamberger*, 379 F. App'x 116, 120 (3d Cir. 2010) (nonprecedential) (noting that district court "correctly determined that a single instance of interference with an inmate's mail is not sufficient to constitute a First Amendment violation" (citing *Bieregu*, 59 F.3d at 1452)).

"pattern and practice" legal mail interference claim unrelated to a DOC policy.

### 3.    Legal Mail - Institutional Policy Claims

Most of Travillion's legal mail interference claims appear to involve the treatment of his mail pursuant to specific DOC policies.  In point of fact, Travillion's allegations almost exclusively target Wetzel (then-Secretary of the DOC) and the DOC itself.[130]  Obviously, neither the Secretary nor the DOC physically handled Travillion's mail at SCI Rockview, and Travillion does not contend otherwise.[131]  Rather, Travillion is alleging that certain policies implemented by Wetzel or the DOC infringed his First Amendment free-speech rights.

As best the Court can discern, Travillion is challenging two different policies: (1) Wetzel's temporary suspension of delivery of incoming and outgoing mail from August 29, 2018, to September 5, 2018;[132] and (2) the DOC's version of DC-ADM 803 in place from approximately September 6, 2018, to April 6, 2019, whereby legal mail was photocopied and then stored in a lockbox (to later be destroyed) and inmates were provided a copy of the mail.[133]

---

[130]  *See* Doc. 32 ¶¶ 38-48.

[131]  *See* Travillion Dep. 43:2-7.

[132]  *Id.* ¶¶ 39, 41-44.  Travillion alleges the prison lockdown and temporary suspension of incoming and outgoing mail began on August 24, 2018, but that assertion is contradicted by the record. *See* Doc. 141-2 ¶ 28; Doc. 141-8 at 4.

[133]  Doc. 32 ¶¶ 40, 45-50.

If Travillion is attempting to challenge the current version of DC-ADM 803 regarding use of Smart Communications for personal mail,[134] such a claim is meritless.  The United States Court of Appeals for the Third Circuit, albeit in a nonprecedential opinion, has already examined the constitutionality of this policy and found that it does not violate an inmate's First Amendment rights.[135] Additionally, various district courts in this circuit have considered the legality of the policy and found that it passes constitutional muster under *Turner v. Safley*.[136] The Court agrees with the rationales and holdings of these cases, which conclude that the use of Smart Communications for nonprivileged correspondence does not infringe a prisoner's First Amendment rights.

Accordingly, the Court will analyze Travillion's First Amendment claims regarding the two now-defunct policies that affected his prison mail.

### a.   Mail Suspension - August 29 to September 5, 2018

Travillion first challenges defendant Wetzel's temporary suspension of incoming and outgoing mail from August 29 to September 5, 2018.  As noted above, this suspension was ordered to address an emergent situation concerning the

---

[134] *See* Doc. 177 at 11-12 (arguing that his claims for injunctive relief are not moot because, *inter alia*, there is "continued copying, digital storage, and confiscation of his protected communications under the current policy to present day").

[135] *See Pelino v. Wetzel*, No. 21-1363, 2022 WL 1239050, at *1-2 (3d Cir. Apr. 27, 2022) (nonprecedential).

[136] *See Smith v. Wolf*, No. 3:19-cv-0711, 2020 WL 4551229, at *6-8 (M.D. Pa. Aug. 6, 2020) (Mariani, J.); *Woodell v. Pa. D.O.C. Sec'y of Corr.*, No. 18-cv-4430, 2020 WL 2841380, at *9-12 (E.D. Pa. June 1, 2020), *aff'd*, No. 20-3235, 2022 WL 17424287 (3d Cir. 2022) (nonprecedential).

entry of illicit drugs into state prisons through prisoner mail. Travillion maintains that the DOC's rationale was a "façade," and that the policy was instead intended to infringe prisoners' constitutional rights.[137] He alleges that, under this eight-day lockdown, he was unable to mail certain legal filings, exam materials, and various pieces of personal mail.[138]

There are several fundamental problems with Travillion's claims against Wetzel for the mail-suspension policy. First, insofar as Travillion is suing Wetzel in his individual capacity as a policymaker,[139] Defendants are correct that any claim for monetary damages is barred by qualified immunity. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."[140] The Court has "discretion to decide which of the two prongs of qualified-immunity analysis to tackle first."[141]

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing

---

[137] Doc. 32 ¶ 39.
[138] *See id.* ¶¶ 41-44.
[139] *See A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004).
[140] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation omitted).
[141] *Id.*

violates that right.'"[142]  "[C]learly established rights are derived either from binding Supreme Court and Third Circuit precedent or from a 'robust consensus of cases of persuasive authority in the Courts of Appeals.'"[143]

Assuming that Wetzel's eight-day suspension of incoming and outgoing mail to curb the entry of illicit drugs into state prisons infringed inmates' First Amendment free-speech rights (which is by no means certain, see below), such a right was not clearly established at that time.  Travillion has pointed to no binding Supreme Court or Third Circuit precedent existing at that time (or ever) showing that a *temporary*, one-week suspension of prison mail to combat an emergency crisis believed to be caused by the mail offends the Constitution.  Nor has this Court identified any such case.  In fact, the opposite is true.  In *Jones v. Brown*, the Third Circuit opined that prison administrators may be justified in implementing temporary, restrictive measures affecting prisoners' legal mail to address emergency, mail-related dangers.[144]  Any claim against Wetzel for money damages is thus barred by qualified immunity, so compensatory, nominal, and punitive

---

[142]  *Id.* at 741 (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

[143]  *Bland v. City of Newark*, 900 F.3d 77, 84 (3d Cir. 2018) (quoting *Fields v. City of Philadelphia*, 862 F.3d 353, 361 (3d Cir. 2017)).

[144]  *See Jones*, 461 F.3d at 362 ("We believe that a prison administrator compelled to act immediately after September 11th and October of 2001 might reasonably have concluded that the risk of an anthrax terrorism attack on a prison was sufficiently unquantifiable to justify a temporary, emergency measure involving the opening of a prisoner's legal mail in his absence.").

damages are unavailable for this claim.[145]

Additionally, any claim for injunctive or declaratory relief is moot because the "policy" at issue lasted for only eight days, ended in September 2018, and there is no reasonable likelihood that Travillion will be subjected to the same allegedly unconstitutional action.[146]  Therefore, summary judgment must be granted with respect to Defendants' assertion of qualified immunity, and any remaining claim for equitable relief must be dismissed as moot.

If Travillion is attempting to sue Wetzel in his official capacity,[147] that claim also fails.  The Eleventh Amendment to the Constitution prevents federal courts from entertaining lawsuits—by United States citizens or citizens of foreign states—brought against a state.[148]  This immunity from private suit extends to state agencies as well as state officials acting in their official capacity, because such

---

[145] *See Doe v. Delie*, 257 F.3d 309, 314 (3d Cir. 2001) (noting that, if qualified immunity applied, nominal and punitive damages claims would be moot); *Abdul-Akbar v. Watson*, 4 F.3d 195, 196-97 (3d Cir. 1993) (vacating award of compensatory and punitive damages upon finding of qualified immunity); *Hicks v. Feeney*, 850 F.2d 152, 155 n.4 (3d Cir. 1988) ("Since [Plaintiff] was not entitled to any judgment while qualified immunity remained open he could not obtain damages, nominal or otherwise, on this record."); *Hopkins v. Saunders*, 199 F.3d 968, 978 (8th Cir. 1999) (collecting cases holding that qualified immunity bars nominal damages).

[146] *See Delie*, 257 F.3d at 313, 314 (holding that prisoner-plaintiff's Section 1983 claims for declaratory and injunctive relief were moot because he had been released from prison and there was "no reasonable likelihood that [he] would be subjected to the same action" complained of in his lawsuit); *Sutton v. Rasheed*, 323 F.3d 236, 248 (3d Cir. 2003) (noting that, when there is "voluntary cessation of a policy," injunctive and declaratory claims are generally moot if there is "no reasonable expectation that the wrong will be repeated").

[147] *See* Doc. 32 ¶¶ 78, 79 (seeking declaratory and injunctive relief against Defendants "in their individual and official capacities").

[148] U.S. CONST. amend. XI; *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267-68 (1997); *Hans v. Louisiana*, 134 U.S. 1, 10 (1890).

lawsuits are essentially civil actions "against the State itself."[149]  States may waive

this immunity if they choose, but Pennsylvania has explicitly not waived its

immunity with respect to claims brought under Section 1983.[150]  There are two

exceptions to the Eleventh Amendment's bar to private suits against nonconsenting

states: (1) "Congress may abrogate a state's immunity" and (2) "parties may sue

state officers for *prospective* injunctive and declaratory relief."[151]

Here, there is no indication that Congress abrogated the state's immunity,

nor can Travillion seek prospective injunctive or declaratory relief.  The mail-

suspension policy at issue, as previously noted, lasted from August 29 to

September 5, 2018, is unlikely to be repeated, and therefore is not amenable to any

type of prospective equitable claim.  Thus, any official capacity claim against

Wetzel for this policy must be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(iii)

and because any claim for prospective equitable relief is moot.

### b.    DC-ADM 803 September 6, 2018 to April 6, 2019

In paragraphs 45 through 50 of his amended complaint, Travillion alleges

that the DOC promulgated a policy whereby his legal mail was illegally

---

[149] *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

[150] *See* 42 PA. CONS. STAT. § 8521(b); *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 310 (3d Cir. 2020); *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 254 & n.5 (3d Cir. 2010) (citing 42 PA. CONS. STAT. § 8521(b)).

[151] *Wheeling & Lake Erie Ry. Co. v. Pub. Util. Comm'n of Pa.*, 141 F.3d 88, 91 (3d Cir. 1998) (emphasis added) (citing, *inter alia*, *Ex parte Young*, 209 U.S. 123 (1908)).

photocopied and stored by prison officials.[152]  As noted above, this practice was ended in April 2019 after litigation and settlement.

Similar to Travillion's official capacity claim against Wetzel, this First Amendment claim against the DOC fails because Eleventh Amendment sovereign immunity bars monetary damages against state agencies,[153] and no prospective equitable relief is available for a policy that was ended in 2019 and is extremely unlikely to be repeated, especially in light of the prior litigation and settlement. Travillion's free-speech claim against the DOC for this short-lived policy must therefore be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(iii) and because any claim for prospective equitable relief is moot.

### c.   Smart Communications – October 2018

Inasmuch as, in a single paragraph, Travillion alleges that Smart Communications violated his free-speech rights by receiving, opening, copying, and storing legal mail from the Governor's Office of General Counsel on a single occasion in October 2018,[154] that claim falters for multiple reasons.  First, assuming this mail was legal or "privileged" correspondence and correctly marked as such, the only way Smart Communications could have received the mail was if

---

[152] Paragraph 40 contains "kitchen-sink" type allegations against Wetzel and Smart Communications and mentions legal mail, but this paragraph appears to be aimed at the general policy of using Smart Communications for processing nonprivileged mail.  It is undisputed that at no time was there a DOC policy whereby legal mail was directed to Smart Communications to be processed.

[153] *See Will*, 491 U.S. at 71.

[154] *See* Doc. 32 ¶ 49.

it was errantly sent to the company by the Governor's Office of General Counsel or forwarded by the prison.  And, as noted above, a single instance of inadvertent interference with legal mail does not state a constitutional violation.[155]  In addition, Travillion repeatedly asserts in his responsive statement of facts that "the policies and practices, not isolated incidents, are at issue" in his legal mail claims,[156] and he admits that he only exhausted administrative remedies concerning the policies, not specific events.[157]

Second, this mail likely did not qualify as "privileged correspondence" as defined by DC-ADM 803.  Rather, it appears to be documents sent by opposing counsel in one of Travillion's many civil appeals—Third Circuit case number 17-3248.  Under the version of DC-ADM 803 existing at the time (as well as the present version), incoming privileged mail includes mail from a court and "[m]ail from *an inmate's attorney* that is either hand-delivered to the facility by the attorney or delivered through the mail system and identified with a control

---

[155] *See Jones*, 461 F.3d at 359 (requiring a pattern and practice of opening legal mail outside of prisoners' presence); *Bieregu v. Reno*, 59 F.3d 1445, 1452 (3d Cir. 1995) ("We decline to hold that a single instance of damaged mail rises to the level of constitutionally impermissible censorship."), *abrogated on other grounds by Lewis v. Casey*, 518 U.S. 343 (1996); *Iwanicki v. Pa. Dep't of Corr.*, 582 F. App'x 75, 79 (3d Cir. 2014) (nonprecedential) (citing *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003)); *Fortune v. Hamberger*, 379 F. App'x 116, 120 (3d Cir. 2010) (nonprecedential) (noting that district court "correctly determined that a single instance of interference with an inmate's mail is not sufficient to constitute a First Amendment violation" (citing *Bieregu*, 59 F.3d at 1452)).

[156] Doc. 174 ¶¶ 33, 38.

[157] *See id.*; Doc. 141-8.

number[.]"[158]  Mail sent by a defense attorney, who does not represent the plaintiff-

recipient and whose communication is not subject to attorney-client privilege, is

not considered to be "privileged" correspondence and therefore must be sent via

Smart Communications.[159]  Thus, on October 9, 2018, Smart Communications was

likely handling *nonprivileged* correspondence pursuant to DC-ADM 803 and such

processing has repeatedly been found to comport with the First Amendment.

　　For the foregoing reasons, any free-speech claim against Smart

Communications must be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

The only allegations against Smart Communications—*i.e.*, its general handling of

personal mail under DC-ADM 803 and the single instance of receiving and

opening mail from Travillion's opposing counsel—do not, and cannot, state a First

Amendment violation.

　　One final comment is appropriate.  With regard to any claim that is

dismissed herein, no leave to amend shall be granted.  First, Travillion has already

been given leave to amend and has failed to cure the deficiencies identified.[160]

Second, leave to amend for most, if not all, of the claims being dismissed as moot

or pursuant to Section 1915(e)(2)(B) would be futile because the underlying

---

[158]  DC-ADM 803 Glossary of Terms, "Privileged Correspondence" 2(a), (b) (2018) (emphasis
supplied); *see also* DC-ADM 803 Glossary of Terms, "Privileged Correspondence" 2(a), (b)
(2020).

[159]  *See id.*; *see also id.* § 1(A)(3).

[160]  *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Jones v. Unknown D.O.C. Bus Driver &
Transp. Crew*, 944 F.3d 478, 483 (3d Cir. 2019) (concluding that, where inmate plaintiff "has
already had two chances to tell his story," providing "further leave to amend would be futile").

substance of the allegations does not, and cannot, state constitutional violations. Finally, leave to amend at this point in the litigation would be prejudicial to Defendants and would not be in the interest of justice, as this case has been languishing for almost five years.

## IV.   CONCLUSION

Based on the foregoing, the Court will grant in part and deny in part Defendants' motion (Doc. 138) for summary judgment as more fully set forth herein and in the accompanying Order.  The Court will also dismiss several of Travillion's First Amendment claims pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and (iii).  These claims should have been dismissed during Section 1915A screening or at the Rule 12(b)(6) stage, but Travillion's "kitchen-sink" style pleading likely frustrated those efforts.  This case will proceed on one remaining Section 1983 claim: First Amendment free-speech interference with incoming personal mail as to defendants McMahon, Boone, Caprio, Harpster, Walters, and Wilson.

An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge